IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:08-CR-32 |
| ) | (VARLAN/SHIRLEY) |
| JEREME DEAL, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. The defendant is charged in a single-count Indictment [Doc. 1], with embezzling a package, which came into his possession as a postal employee and which was intended to be conveyed by mail and delivered by the Postal Service. This case is before the Court on the Defendant's Motion to Dismiss for Failure to State an Offense [Doc. 16], alleging that the indictment does not state an offense that the defendant has violated, and the Defendant's Motion to Suppress Defendant's Statements [of] March 21, 2006 [Doc. 18], contending that his statement was not knowingly, intelligently, and voluntarily made. The government responds [Doc. 22] that the issues raised by the defendant regarding defects in the indictment are actually factual matters that are for the jury. It also maintains [Doc. 23] that the defendant signed a written waiver of his Miranda rights and was not impaired at the time of his confession.

1

The parties appeared for a motion hearing on August 4, 2008. Assistant United States Attorney Matthew T. Morris was present representing the government. Attorney Edgar R. Jones represented the Defendant, who was also present. The Court heard the evidence presented and the arguments of the parties on both motions. After the conclusion of the hearing, the Court took the motions under advisement, on August 5, 2008.

## I.  FACTS

The government called Special Agent Rick Ellison, an Inspector General for the Department of Veterans' Affairs. He testified that on March 21, 2006, he was involved in an investigation at the Lenoir City Post Office. He and Knoxville Postal Inspector Dennis Hitzing prepared a "test package." In the package, he placed a pill bottle labeled as Hydrocodone 7.5 and Acetaminophen 500 but actually containing calcium citrate pills. He also placed a transmitter in the package, which would emit a silent radio tone when someone opened or tampered with the package. The package was addressed to Dennis Collins at a Lenoir City post office box and bore a return address for the Veterans' Affairs Medical Center in Nashville. After lunch, he gave the package to Jim Bishop, the Lenoir City Postmaster. At 2:20 p.m., Bishop placed the package in the general delivery area along with other mail for Dennis Collins. Ellison maintained audio contact with the package and the others involved in the investigation. Hitzing, who was stationed in the post office's observation gallery, called Ellison and told him that the package had been placed in the general delivery area.

Ellison testified that he called the defendant at the Lenoir City Post Office, identified himself as Dennis Collins, and asked whether a package was there for him. He explained that he

2

was scheduled to move to Lenoir City but that his move had been postponed. He said that he was expecting a package containing hydrocodone from the VA and asked if the defendant would check to see if it was there. The defendant placed him on hold and when he returned, told Ellison that he had a letter but no package. Ellison told the defendant that he could not refill his prescription in Nashville because his package had gone out. He asked the defendant if he would check around for the package and if he found it, scan it as undeliverable so that he could get a refill of his medication. He said that the defendant took his cell phone number.

Ellison then called Hitzing, who said that he had seen the defendant go to the general delivery area and pick up the package and a letter. Hitzing saw the defendant place the package in a tub under his desk and overheard him tell Ellison that he had only found a letter. A few minutes later, the defendant called Ellison back and said that he had found the package. The defendant said he would scan the package as undeliverable and would return it to the sender. Ellison thanked the defendant.

Ellison testified that one hour later, Hitzing radioed him and reported that the defendant had put the package under a sweatshirt and was walking outside. Ellison saw the defendant go to a car in the parking lot. Within seconds of defendant's entry into the car, the transmitter in the package alarmed. Ellison activated his blue lights, and he and the other investigators surrounded the defendant.

Ellison removed the defendant from his car, handcuffed him, and arrested him. Inspector Ronald McMurray identified the officers to the defendant. Ellison told the defendant that he knew about the package. He gave the defendant a Consent to Search form, which the defendant signed. Once the defendant consented, he and McMurray searched the defendant's vehicle and

3

found the package inside on the front seat. A corner of the package was torn.

Ellison testified that Postal Inspector J.W. Bowden took the defendant to the Postal Inspector's office in Knoxville. Once there, the defendant was given the Miranda warnings. Ellison said that the defendant was not under arrest but was in custody. He interviewed the defendant, who gave a written statement. Ellison identified the statement, which was exhibit 4 at the hearing. The statement contains an advice of rights section, which the defendant initialed at 4:30 p.m. Ellison stated that he also advised the defendant of his rights verbally. Ellison saw the defendant initial the rights waiver and write the statement in his own handwriting.

Ellison said that after the defendant gave the statement, he was fingerprinted and photographed. The United States Attorney's office declined to take him into custody, so they drove the defendant back to his car in Lenoir City, where the defendant was released. Three and one-half to four hours elapsed from the time the agents first approached the defendant in his car until he was released. Regarding the defendant's condition on that afternoon, Ellison said that the defendant seemed fine and seemed to understand what was said to him. The defendant was alert, coordinated, did not slur his speech, and was able to walk without assistance. He said the defendant did not seem drowsy and that if he had believed that the defendant was impaired, he would not have released him to drive himself home. He did not recall the defendant saying that he had taken hydrocodone that day.

On cross-examination, Special Agent Ellison testified that he had prepared the test package in his hotel room and that it was never in the mail at the VA center in Murfreesboro. He said the package bore a prepaid VA permit but that he did not pay the postage for it. Ellison said that he was not on the observation platform and did not see where the package was placed. Hitzing

4

told him that he saw the defendant walk up to the counter, pick up the package, return to his desk, and place the package under his desk. Ellison said that while on the telephone with the defendant, he told the defendant that the package contained hydrocodone and that he was trying to refill his hydrocodone prescription in Nashville. He agreed that he did not know what set off the transmitter in the package and that dropping the package could potentially set it off.

Ellison admitted that he knew the defendant had fractured his foot and had a prescription for hydrocodone. He said that he gave the defendant verbal <u>Miranda</u> warnings at the Post Office, and the defendant said that he did not have any questions at that time. Ellison took the defendant into custody at 4:00 p.m., gave him the written <u>Miranda</u> warnings at 4:30 p.m., and then began to question him. The defendant read the form and said he understood it. Ellison did not ask the defendant if he was on any medication that day. Ellison said he did not help the defendant write his statement. He said he tells anyone whom he interviews that he will answer questions but the individual has to write his or her own statement. The defendant completed the statement between 6:00 and 6:30 p.m. Ellison stated that he had previously questioned persons on hydrocodone and that the drug affected people differently. He explained that one individual might be knocked out by a single hydrocodone pill, while another person could take up to thirty pills in one day with out it affecting him or her. On redirect examination, Ellison stated that when he removed the package from the defendant's vehicle, the bottom left corner had been pulled back and the mylar seal was stretched. The package was not in this condition when he gave it to Postmaster Bishop.

Postal Inspector Ronald McMurray testified that he was involved in the investigation of the defendant. On the day in question, McMurray conducted surveillance from a side street by the post office. He was in contact with other law enforcement officers by radio. Hitzing radioed

5

that the defendant was coming out. He saw the defendant go to his car with a jacket in his hand. The defendant placed the jacket inside the car and then got in the car himself. The electronic device went off, and McMurray went to the back of the parking lot. Officers Nelson and Bowden handcuffed the defendant and put him in the back of Bowden's car. Hitzing gave him a consent to search form and asked him to read it to the defendant. He read the form to the defendant and filled in the handwritten parts of the form. He then watched the defendant sign it. While he only interacted with the defendant for five minutes, the defendant had no trouble speaking or staying awake. He described the defendant as being obviously nervous and as limping from his foot injury. He believed the defendant understood him.

On cross-examination, Inspector McMurray testified that his surveillance location was was seventy-five yards away from the defendant's vehicle at an angle. He said the time of 4:31 p.m. written on the consent form was the time that the advice of rights ended. He did not ask the defendant if he was on any medication. He agreed that he had never spoken with the defendant before and did not know his normal demeanor.

The defense called Denene Evans, a nurse manager at Baptist Healthcare Center in Lenoir City. Ms. Evans testified that the defendant is her daughter's boyfriend and that the couple had lived with her for five years. She said that in January 2006, the defendant injured his foot at his job at the post office. The defendant received Ultram, a medicine for arthritis, from the hospital, and when he came home around 8:30 p.m., he was in serious pain. She took the defendant back to the hospital, where they learned that a second reading of the defendant's x-ray revealed that he had fractured his foot. The hospital staff said they had contacted the defendant's supervisor Steve Furry about the fracture after the defendant left the hospital. Evans believed that the defendant got a

6

prescription for hydrocodone at this point.

Evans stated that she told the defendant's supervisor that he had returned to the hospital and that the defendant had fractured his foot. She expressed her concern about the defendant driving under the influence of hydrocodone. The supervisor instructed the defendant to return to work and to take his medication once he arrived. The defendant was assigned to a desk job.

Evans said that although the defendant was normally a gentle person, he became anxious and seemed to have no relief from the pain in his foot. When she learned that he was taking hydrocodone 7.5, she cautioned him that he could get addicted. She believed that the defendant did become addicted to hydrocodone. By March 21, 2006, his demeanor had changed. He was no longer outgoing and talkative. When he came home from work, he withdrew from the rest of the family. She thought that the defendant was under the influence of hydrocodone on the day of the offense. During the summer following the incident, the defendant received treatment for his addiction at Bridges to Recovery.

On cross-examination, Ms. Evans testified that although she knew that the defendant was addicted to hydrocodone, she allowed him to continue to live with her and to come and go from her house. She said that on the morning of March 21, 2006, she saw the defendant momentarily between 5:30 and 5:45 a.m. as she was leaving for work.

Kayla Breann Evans testified that she worked as a housekeeper at Baptist Healthcare nursing home and that she had dated the defendant for eight years. She and the defendant had lived together in her mother's home for five years. In March 2006, the defendant was heavily medicated for a broken foot. On March 21, he took Hydrocodone 7.5 before he left for work. When he returned home around 9:30 p.m. that day, he was under the effect of medication. When the

7

defendant was on the medication, he was withdrawn, quiet, and kept to himself.

Patricia Ann Deal, the defendant's mother, testified that she saw the defendant daily. On March 21, 2006, he came to her home around 8:30 p.m. and was upset about what had happened that day. She said that he did not seem like himself. She knew that the defendant regularly took prescription medication, which caused him to be withdrawn. On cross-examination, she said that she did not know what the defendant did before coming to her home on March 21. She did not know if he took hydrocodone on that day.

The defendant testified that he had been prescribed Hydrocodone 7.5, which is the second highest dosage, when he broke his foot. On March 21, 2006, he took hydrocodone at least three times, consuming six to eight pills between 7:00 a.m. and 3:00 p.m. He was authorized to take them at work by his supervisor Steve Furry and he took them in his car, at his desk, or in the bathroom. The defendant reported having only a vague recollection of the afternoon of March 21. He remembered going to his car but did not recall being advised of his rights by the agents or being asked if he was on any medication. He agreed that he may have signed a consent form, but he did not fill it out. He remembered being taken to Knoxville, but he did not recall being advised of his rights there. He gave a handwritten statement but believed that the agents told him what to write.

The defendant said that he completed a twenty-eight-day program at Bridges to Recovery on addiction awareness. He said that hydrocodone made him feel numb, confused, and unaware of his surroundings or what he was doing.

On cross-examination, the defendant testified that he broke his foot in early January 2006 and returned to work three days later with his foot in a cast. He was suppose to elevate his leg, and he was given the job of answering the telephone and rating mail as undeliverable or as having

8

an insufficient address. He continued in these duties through March 21, 2006. On that date, he had taken between six and ten hydrocodone pills by 3:00 p.m. He kept the pills in his pocket. His initial prescription was for a two-week supply, and then he bought the pills "off the street." Although he had been taking hydrocodone from January through March, he had received no reprimands about the quality of his work. The defendant stated that he had graduated from high school. He agreed that his signature was on the Consent to Search form. Although he vaguely remembered signing it, he did not remember the agents advising him of his rights. He identified his initials, handwriting, and signature on his sworn statement. He agreed that the statement listed his constitutional rights, and he believed that the agents went over them.

The defendant was recalled and testified that on March 21, 2006, he was not aware of any package in the mail. His supervisor Steve Furry brought a package to him while he was at his desk. On cross-examination, the defendant acknowledged that although he was wearing a foot brace on March 21, 2006, he could walk without crutches. Sometime before April 28 while the defendant was in rehabilitation, Furry told him that Furry had given him the package. The defendant vaguely remembered Furry giving it to him but stated he was going on what Furry told him.

## II. ANALYSIS

The defendant challenges both the indictment and his March 21, 2006 statement. The Court will consider each of these issues in turn.

### A. Sufficiency of the Indictment

Our Constitution requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment by a grand jury[.]" U.S. Const.

9

Amend. V. The present indictment [Doc. 1] charges that the defendant violated 18 U.S.C. section 1709 as follows:

> On or about March 21, 2006, in the Eastern District of Tennessee, Defendant JEREME DEAL, being an employee of the United States Postal Service, embezzled a package which came into his possession intended to be conveyed by mail and delivered by a carrier, messenger, agent and other person employed by the Postal Service.

The defendant calls for the dismissal of the indictment, arguing that it fails to state an offense that he has violated. He argues that he was entrapped by postal authorities, who failed to investigate the incident properly. Specifically, he alleges four errors: (1) the allegedly embezzled package was not "mail," (2) the package was not intended to be conveyed in the United States mail, (3) he did not embezzle the package because he possessed it on post office property without opening it, and (4) the six to eight hydrocodone pills he ingested that day prevented him from forming the requisite intent to violate the statute.

The government responds that the indictment sets forth the elements of the offense and provides the defendant with adequate notice of the charge against him. It contends that the defendant's assertions challenge the sufficiency of the government's evidence to prove those elements, which is a matter for the jury to determine at trial.

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). A defendant may challenge a defect in the indictment, such as its failure to state an offense, before trial. Fed. R. Crim. P. 12(b)(2). Claims that the allegations in

10

the indictment are false or untrue, however, are not matters for the court to determine pretrial. Universal Milk Bottle Service v. United States, 188 F.2d 959, 962 (6th Cir. 1951). Such claims in a criminal case are matters reserved for the jury unless they are waived. Id.; see Fed. R. Crim. P. 12(b)(1) (only defenses or objections that can be determined "without a trial of the general issue" can be raised pretrial). In the present case, the defendant argues that facts outside the indictment–the type of package involved, the way in which it came into his possession, etc.–show that the facts alleged by the government in the indictment are not true. This is precisely the "general issue" for the jury to determine in this case.

> The defendant is charged with a violation of 18 U.S.C. section 1709, which provides:
>
> Whoever, being a Postal Service officer or employee, embezzles any letter, postal card, package, bag, or mail, or any article or thing contained therein entrusted to him or which comes into his possession intended to be conveyed by mail, or carried or delivered by any carrier, messenger, agent, or other person employed in any department of the Postal Service, or forwarded through or delivered from any post office or station thereof established by authority of the Postmaster General or of the Postal Service; or steals, abstracts, or removes from any such letter, package, bag, or mail, any article or thing contained therein, shall be fined under this title or imprisoned not more than five years, or both.

In United States v. Rupert, a Pennsylvania District Court examined whether the indictment alleging a violation of 18 U.S.C. section 1709 stated an offense. 510 F. Supp. 821, 822 (M.D. Penn. 1981). There the court set out to "determine whether, based on the indictment, the Government's contentions of what it will prove and the facts the Defendant is willing to concede for the purposes of the motion the indictment states offenses against the United States." Id. In other words, taking the facts as they are alleged by the government, does the indictment set forth an offense.

> The defendant's first argument is that the test package in question is not mail within

11

the meaning of the statute because it was addressed to a fictitious person, was not really from the named sender, and no postage was actually paid thereon. The government contends that although the package was a decoy, it appeared to be an actual piece of mail. The fact that the package was a decoy or test package does not prevent the embezzlement of it from falling within the statute. United States v. Scott, 172 U.S. 343, 349-50 (1899) (affirming earlier case law holding "the fact that the letter was a decoy was no defense"). The Supreme Court has ruled with regard to a statute that preceded section 1709 that if an article that outwardly resembles a genuine piece of mail comes into a postal employees' possession during the regular course of his duties, then "it is not for [the employee] to judge its genuineness." Goode v. United States, 159 U.S. 663, 671 (1895); see also United States v. Hergenrader, 529 F.2d 83, 85 (8th Cir. 1976) (holding decoy letter addressed to fictitious person constituted mail); Rupert, 510 F. Supp. at 823 (holding that a test letter to fictitious person was mail for the purposes of section 1709). The duty of a postal employee is the same for a decoy letter or package as it is for any other piece of mail. Scott, 172 U.S. at 350-51.

Secondly, the defendant asserts that the package was not "intended to be conveyed by mail" as required by the statute because it was never in any part of the mail handling process but, instead, was handed to him at his desk by his another postal worker. The government states that the defendant retrieved the decoy package from the "notified parcels placed for pick-up" section of the post office. In his brief, the defendant agrees that the test for whether an item has been conveyed in the mail under section 1709 is an objective one. "The subjective intent of the person who prepared the letter is not relevant; rather, an item was intended to be conveyed by mail if a reasonable person who saw the letter would think it was a letter that was intended to be delivered." Rupert, 510 F. Supp. at 823; see also Hergenrader, 529 F.2d at 85. Indeed, "[i]t is the appearance

12

which it carries to the postal employee which is crucial." Hergenrader, 529 F.2d at 85. The fact that a decoy letter or package is "placed in the postal process without having been deposited in the usual manner" does not prevent it from being "conveyed in the mail" as contemplated by section 1709. United States v. Kent, 449 F.2d 751, (5th Cir. 1971).

In Rupert, postal inspectors placed a test letter addressed to a fictitious person with an actual return address and bulk rate permit into the "no value" section of the throwback case, a portion in the post office for undeliverable mail. 510 F. Supp. at 822. The court held that the letter had been conveyed in the mail, even though it had never been put into an actual collection box, because it was put in "part of the mail handling process." Id. at 824. Similarly, in Kent, a decoy letter placed in a postal worker's tray facing her at a work table was held to be conveyed in the mail under section 1709 because it was put in the postal process. 449 F.2d at 752. In Hergenrader, the court held that a decoy letter placed in a wastebasket in the post office work room floor was conveyed in the mail within the meaning of the statute because it "had proper postage stamped on it, was addressed and sealed, and was within the area of an official United States Post Office where mail was being processed." 529 F.2d at 85. In the present case, the government alleges that the postmaster placed the decoy package in the area of the post office designated for parcels awaiting pick-up. Accordingly, the package was "intended to be conveyed by mail" within the meaning of the statute. The defendant's contention that he was handed the package at his desk is a factual matter not properly raised at this juncture.

Third, the defendant argues that the entire time he possessed the package he was on duty and remained on the post office property. He maintains that he did not open the package or remove its contents. The government's brief alleges that the defendant took the decoy package out

13

of the post office and to his personal vehicle parked in the post office parking lot. After he put the package in his car, a transmitter in the package alarmed, signaling that the package had been opened. The package was found in the defendant's car with a tear on one corner. "[I]n order to be guilty of embezzling mail in violation of section 1709 [a defendant] need not remove the mail matter from the premises of the post office." United States v. Holley, 463 F.2d 634, 638 (5th Cir. 1972) (affirming jury instruction on this premise); see also Kelley v. United States, 166 F.2d 343, 346 (9th Cir. 1948) (holding that postal janitor's diversion of packages to the trash constituted embezzlement even though the parcels were never removed from the post office). In Holley, the defendant postal employee placed several letters including a test letter in his pocket, clocked out, and proceeded toward the exit, when he was stopped by postal inspectors. 463 F.2d at 636. In comparison, the government's allegation that the defendant took the decoy package to his car in the parking lot unquestionably states a crime.

Finally, the defendant contends that he could not form the requisite intent to embezzle the package because he was under the influence of hydrocodone. The Court agrees with the government that such argument may provide a defense to be argued to the jury but is not a reason for dismissing the indictment. Intent is for the jury to determine. The extent, if any, to which he may have been under the influence of hydrocodone is a fact question for the jury to resolve and such is particularly true in light of the conflicting testimony on this issue. Additionally, the extent to which the alleged taking of hydrocodone, if any, had on the defendant's ability to form intent is also for the jury to determine. Defendant has not established this matter to the extent this Court could rule as a matter of law that defendant did not form the requisite intent.

Furthermore, the Court notes the defendant's intent may be derived from his actions

14

in secreting the package under an article of clothing and taking it to the parking lot, as the government has alleged. Such is sufficient to state an offense of embezzling mail under section 1709.

In essence, the defendant insists that the government has wrongfully charged him in the present case because it lacks the substantive evidence to support a conviction under section 1709. The Court finds that the government has stated an offense under the facts as asserted in this case. Whether sufficient evidence exists to prove the allegations beyond a reasonable doubt is a matter for the jury. The undersigned **RECOMMENDS** that the Defendant's Motion to Dismiss for Failure to State an Offense [**Doc. 16**] be denied.

**B. Suppression of the Defendant's Statement**

The defendant also moves to suppress [Doc. 18] his oral and written statements to postal inspectors on March 21, 2006, contending that they were not knowingly, intelligently, and voluntarily made because he was under the influence of hydrocodone. The government contends that the defendant was advised of his Miranda rights and waived them in writing. It maintains that if he had taken hydrocodone before his confession, it did not cause him to be impaired to the extent that it rendered his confession involuntary.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial."

15

Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Additionally, even when the Miranda warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those Miranda rights before it may introduce an incriminating statement by a defendant. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." McCall, 863 F.2d at 459 (citing Connelly, 479 U.S. at 163-64).

The Court finds the following facts relevant to the defendant's statements to the officers: The defendant fractured his foot in January 2006 and received a two-week prescription for hydrocodone. The defendant took hydrocodone while he was at work and up through the day of the offense. In the afternoon of March 21, 2006, the defendant was asked by Special Agent Ellison, posing as Dennis Collins, to check on a package purportedly containing hydrocodone. The defendant walked to the general delivery area, retrieved the decoy package, and placed it under his desk. However, the defendant at first denied it was there, and laater stated he had scanned the

16

package as undeliverable. An hour later, the defendant placed the package under an article of clothing and walked to his car in the post office parking lot. A transmitter hidden in the package alarmed, and at least four postal inspectors or agents came to the defendant's car. They removed the defendant from his car and handcuffed him.

Inspector McMurry read a Consent to Search form to the defendant, who signed the form. The defendant was taken into custody around 4:00 p.m. and transported to the Knoxville Postal Inspectors' office. The defendant was verbally advised of his Miranda rights and given a form containing a rights waiver, which he initialed at 4:30 p.m. The form expressly states "I understand and know what I am doing. . . . . This statement is voluntary on my part . . . ." The defendant hand wrote a two-page statement confessing to taking a package to his car. He signed the statement. The defendant was then driven back to his car at the Lenoir City Post Office and allowed to drive away. From the time the officers approached the defendant at his car until his release took three and one-half to four hours. Special Agent Ellison and Inspector McMurray perceived the defendant to be alert and to have no difficulty speaking. Although he was limping, he was able to walk without assistance. Inspector McMurray described the defendant as nervous, but both officers felt he was able to understand them. The defendant acknowledged that he had received no reprimands on the quality of his work despite his taking hydrocodone from January to March.

To assess whether a confession was voluntary, the Court must "examine 'the totality of the circumstances surrounding the confession, both the characteristics of the accused and the details of the interrogation, and determine[ ] their psychological impact on an accused's ability to resist pressures to confess.'" United States v. Rigsby, 943 F.2d 631, 635 (6th Cir. 1991) (quoting United States v. Brown, 557 F.2d 541, 546 (6th Cir.1977)). In the present case, the Court finds that

17

the defendant has failed to prove that the conduct of the law enforcement officers was objectively coercive. Although the defendant was in law enforcement custody, there is no evidence that the officers attempted to intimidate the defendant. The defendant was given the Miranda warnings both orally and in written form. The defendant was permitted to write out his own statement and was able to do so.

Although the defendant claims to have been under the influence of hydrocodone, this alone does not render his confession involuntary: "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." United States v. Newman, 889 F.2d 88, 94 (6th Cir. 1989); see also United States v. Dunn, 2008 WL 698940, at *4 (6th Cir. Mar. 17, 2008) (holding that defendant's assertion that he was under the influence of Vicodin and marijuana when he waived his rights did not render his statement involuntary in the absence of police coercion). Here, the Court finds no evidence of coercion on the part of the officers. Moreover, the testimony at the suppression hearing revealed that the defendant's consumption of hydrocodone did not affect his ability to work or to write. The testimony also indicated the defendant had the ability to conceive of a plan to assure the caller that the package wasn't there and then the package had been scanned as undeliverable, and then to secrete the package out of the facility into his care. The officers' testimony about the defendant's demeanor and conduct belies the defendant's contentions that he was confused and not aware of what he was doing. Accordingly, the Court finds that the defendant's oral and written statements to law enforcement on the afternoon of March 21, 2006, were made voluntarily, knowingly, and intelligently. It

18

**RECOMMENDS** that the Defendant's Motion to Suppress Defendant's Statements [of] March 21, 2006 [**Doc. 18**] be denied.

### III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds that the Indictment in this case states an offense and that the defendant voluntarily made his statements on March 21, 2006. For the reasons set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Dismiss for Failure to State an Offense [**Doc. 16**] and the Defendant's Motion to Suppress Defendant's Statements [of] March 21, 2006 [**Doc. 18**] be **DENIED**.[1]

Respectfully submitted,

   s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, ___ F.3d ___, 2008 WL 3288304, at *3 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).